**The COSMETIC, TOILETRY AND FRAGRANCE ASSOCIATION, INC., Faberge, Incorporated, Revlon, Inc., and Estee Lauder Inc., Plaintiffs,**

v.

**STATE OF MINNESOTA, Warren Spannaus, Attorney General for the State of Minnesota, Minnesota Pollution Control Agency, an agency of the State of Minnesota, and its Executive Director, Defendants.**

No. Civ. 3–77–434.

United States District Court,
D. Minnesota,
Third Division.

Nov. 30, 1977.

---

**10.** *See* note 1 *supra.*

Matthew J. Levitt, Lee Bearmon, J. Patrick McDavitt, Levitt, Palmer, Bowen, Bearmon & Rotman, Minneapolis, Minn., for plaintiffs.

Warren Spannaus, Atty. Gen., Byron E. Starns, Chief Deputy Atty. Gen., Kenneth E. Raschke, Jr., Asst. Atty. Gen., and Stephen A. Shakman, Special Asst. Atty. Gen., St. Paul, Minn., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

DEVITT, Chief Judge.

In this action challenging the constitutionality of Minnesota Laws 1977, ch. 373, § 1, subd. 2, plaintiffs, a non-profit, incorporated trade association for the cosmetic industry and three individual cosmetic manufacturers and distributors, initially moved for an order temporarily restraining defendants from enforcing or implementing

the questioned statute until a hearing could be held on a further motion for a preliminary injunction. Prior to any consideration of that motion, the court informally requested that plaintiffs notify defendants of the motion and set a hearing date. The hearing was held on October 20, 1977 at which time the parties agreed that the motion could be treated as one for a preliminary junction provided further briefs could be submitted by October 26, 1977. The briefs were timely filed, and the court issued a preliminary injunction on October 31, 1977. This memorandum is intended to set forth the court's findings of fact and conclusions of law in conformity with Rule 52(a) of the Federal Rules of Civil Procedure.

The challenged statute, enacted on May 21, 1977, requires that any pressurized container employing a saturated chlorofluorocarbon propellant sold at wholesale within Minnesota on or after October 31, 1977 shall display on its front panel the following warning:

> Warning: Contains a chlorofluorocarbon that may harm the public health and environment by reducing ozone in the upper atmosphere.

This warning is a preparatory step toward the total ban of such propellants effective July 1, 1979. Minnesota Laws 1977, ch. 373, § 1, subd. 1. This procedure parallels that taken by the United States Food and Drug Administration (FDA) in its attempt to regular chlorofluorocarbon propellants for cosmetics under the authority of the Food, Drug, and Cosmetic Act of 1938, 21 U.S.C. § 301, *et seq.* (1970). On April 26, 1977, the FDA promulgated a regulation which requires a warning identical to that required by the challenged statute, 42 F.R. 22033 (1977), and on May 10, 1977 proposed a rule banning such propellants after April 15, 1979, 42 F.R. 24541 (1977). Although the warnings required by the FDA and the

state are identical in content and extremely similar in most other respects, plaintiffs point to four inconsistencies, two involving warning placement and two concerning effective date, which allegedly make compliance with both rules unduly burdensome, if not impossible.[1]

The most important distinctions between the FDA regulation and the challenged statute are with regard to the placement of the warning. The federal rule requires that the warning ". . . appear on an appropriate panel with such prominence and conspicuousness as to render it likely to be read and understood by ordinary individuals under normal conditions of purchase." The Minnesota statute unequivocally states that the warning shall appear on the front panel. Furthermore, the regulation takes the functional approach of allowing the warning to be placed where it will most effectively trigger purchaser awareness, while the statute stipulates that the warning appear on the immediate container.

■ The law in this circuit is clear with respect to the dual showing movants must make in order to obtain a preliminary injunction. They must show a substantial probability of success at trial on the merits and irreparable harm absent the grant of injunctive relief. *American Train Dispatchers Assn. v. Burlington Northern, Inc.,* 551 F.2d 749 (8th Cir. 1977) and *Minnesota Bearing Co. v. White Motor Corp.,* 470 F.2d 1323 (8th Cir. 1973). In the latter case, the court also indicated other factors which might be considered by the court, specifically absence of substantial harm to other interested parties and absence of harm to the public interest. This latter statement impliedly affirmed the practice of this district in which all four tests must be met before a preliminary injunction will issue. *Cox v. Northwest Airlines, Inc.,* 319 F.Supp. 92 (D.Minn.1970). These factors will be considered seriatim.

---

1. It now appears that defendants do not seriously argue that the statute and the regulation do not conflict as to the two inconsistencies regarding effective date. They attempted to settle these aspects of the problem in their proposed temporary restraining order. On the other hand, these conflicts are transitory—they terminate once both requirements are fully operative. Consequently, the court deems these variations to be of minimal importance and not deserving of further discussion.

**1220**

## I.

Plaintiffs base their constitutional attack on two separate theories—(1) that state legislation in the area of aerosol product labeling has been pre-empted by federal regulation in this field and is therefore unconstitutional under the Supremacy Clause of the United States Constitution, U.S.Const. art. VI, cl. 2; and (2) that the statute effects an unreasonable burden on interstate commerce violative of the Commerce Clause, U.S.Const., art. I, § 8, cl. 3. Since the court preliminarily concludes that state legislation with regard to the ozone deterioration warning has been pre-empted by the FDA's regulation, the second aspect of plaintiffs' argument need not be considered.

■ The court initially must approach the question of federal pre-emption from the viewpoint that a finding of pre-emption is the exception rather than the rule.

If Congress is authorized to act in a field, it should manifest its intention clearly. It will not be presumed that a federal statute was intended to supersede the exercise of the power of the state unless there is a clear manifestation of intention to do so. The exercise of federal supremacy is not lightly to be presumed. *Schwartz v. Texas,* 344 U.S. 199, 202–203, 73 S.Ct. 232, 235, 97 L.Ed. 231 (1952).

Given that point of departure, the court must examine the language and purpose of the federal statute, its legislative history, its field of operation, and points of literal and practical conflict between the federal and state enactments to determine whether the heavy burden of demonstrating pre-emption has been met. The most recent comprehensive opinion in this circuit setting forth the format for judicial analysis when a pre-emption issue is raised is that of former Chief Judge Matthes in *Northern States Power Co. v. State of Minnesota,* 447 F.2d 1143, 1146–47 (8th Cir. 1971), *aff'd,* 405 U.S. 1035, 92 S.Ct. 1307, 31 L.Ed.2d 576 (1972). The prescribed analysis is basically four-tiered. As was the case in *Northern States Power Co.,* only the fourth and final

step is disputed in this case. That is, no one contends that the FDA exceeded its statutory authority in promulgating the federal rule or that Congress acted unconstitutionally in permitting this type of regulation under the Food, Drug, and Cosmetic Act; that compliance with both the federal regulation and the state statute is physically impossible; or that the Food, Drug, and Cosmetic Act contains an express pre-emption provision. Therefore, the analysis must turn to the doctrine of implied pre-emption.

■ In *Northern States Power Co.,* Judge Matthes articulated four key factors which must be considered in determining whether pre-emption of a particular area of regulation has occurred. These factors, distilled from the many cases which have considered pre-emption questions, are:

(1) the aim and intent of Congress as revealed by the statute itself and its legislative history . . .; (2) the pervasiveness of the federal regulatory scheme as authorized and directed by the legislation and as carried into effect by the federal administrative agency . . .; (3) the nature of the subject matter regulated and whether it is one which demands "exclusive federal regulation in order to achieve uniformity vital to national interests." . . .; and (4) "whether, under the circumstances of [a] particular case [state] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Northern States Power Co., supra* at 1146–47.

The court has examined recent pre-emption cases and has concluded that these tests retain continued force today. Although slightly more of the recent Supreme Court cases have refused to find pre-emption when the issue was raised, the court is not convinced, as defendants contend, that there is an emerging presumption against pre-emption any stronger than that previously stated—that pre-emption is the exception rather than the rule.[2] Alleged trends

2. The most that can be said of the recent cases is that the Court has emphasized factor number four in analyzing the implied pre-emption issue and has insisted on a detailed factual

of this sort are particularly unhelpful in this area of the law where each case must turn on an examination of the particular federal and state regulatory schemes in question.

Now, turning to the first of these four factors, neither party has been able to point to any aspect of the statute or to any legislative history which sheds light on the question of congressional intent to pre-empt state regulation in the enactment of the Food, Drug, and Cosmetic Act of 1938. A brief examination of the history of food, drug, and cosmetic regulation in this country leads the court to believe that pre-emption of the type at issue in this case was not considered important by Congress at the time the statute was passed. However, subsequent events and enactments indicate that Congress would desire pre-emption if the issue were to be raised today.

■ Historically, except in rather limited circumstances, the FDA has enforced the requirements of the Food, Drug, and Cosmetic Act by promulgating non-binding interpretative regulations to be applied on a case-by-case, adjudicatory basis. Only in recent years has the agency begun to issue substantive regulations under its rule-making authority. These latter regulations are binding, authoritative interpretations of a statute and are judicially reviewable only under the arbitrary and capricious standard. *See generally, National Nutritional Foods Association v. Weinberger*, 512 F.2d 688, 695–701 (2nd Cir. 1975), *cert. denied*, 423 U.S. 827, 96 S.Ct. 44, 46 L.Ed.2d 44 (1975). In fact, the FDA's authority to issue such regulations has been clearly recognized only very recently. *Weinberger v. Hynson, Westcott and Dunning, Inc.*, 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973); *Ciba Corp. v. Weinberger*, 412 U.S. 640, 93 S.Ct. 2495, 37 L.Ed.2d 230 (1973); *Weinberger v. Bentex Pharmaceuticals, Inc.*, 412 U.S. 645, 93 S.Ct. 2488, 37 L.Ed.2d 235 (1973); and *USV Pharmaceuticals, Inc.*

*v. Weinberger*, 412 U.S. 655, 93 S.Ct. 2498, 37 L.Ed.2d 244 (1973).

This history of case-by-case enforcement reasonably leads to the inference that in 1938, Congress viewed pre-emption in the food, drug, and cosmetic field, if it thought about it at all, as a rather limited doctrine. That is, pre-emption would occur in a situation where the FDA was seeking to enforce an interpretative rule against a particular product in a specific administrative adjudicatory proceeding while a state was attempting to enforce its rules against the same product. This is a far cry from the type of pre-emption at issue here—that by virtue of legislative rules promulgated by the FDA, state activity in the area regulated is barred. It is only in recent years that this species of "administrative pre-emption" has become possible. Thus, the court concludes that a determination of whether pre-emptive intent existed in 1938 is irrelevant to the case at bar.

■ The sole suggested aids for analysis of pre-emptive intent are two more recently enacted statutes which also deal with the problem of consumer product labeling—the Federal Hazardous Substances Act (FHSA), 15 U.S.C. § 1261 *et seq.* (1970) and the Consumer Product Safety Act (CPSA), 15 U.S.C. § 2051 *et seq.* (Supp. II, 1972). Both of these statutes contain express pre-emption provisions. The only attempt by defendants to diminish their importance is the statement that the pre-emption section of FHSA was enacted as part of the Child Protection Act of 1966, a statute which defendants claim had a much more limited purpose than the statutes under consideration. If defendants are claiming that this alleged limited purpose somehow limits the reach of the pre-emption provision, they are clearly wrong. The 1966 amendment unequivocally relates the pre-emption aspect to the entire FHSA. 80 Stat. 1305 (1966). Moreover, the presently

record in deciding whether the state statute poses an actual obstacle to the effectuation of federal policy. *Jones v. Rath Packing Co.*, 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977);

*DeCanas v. Bica*, 424 U.S. 351, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976); and *New York State Department of Social Services v. Dublino*, 413 U.S. 405, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973).

operative pre-emption provision of FHSA is that found in the 1976 amendments to FHSA and several other statutes, generally entitled the Consumer Product Safety Commission Improvements Act of 1976, Pub.L. No. 94–284 (May 11, 1976). As to the permissibility of using such statutory aids in general, it is fundamental that statutes *in pari materia* should be construed with reference to one another. 2 F. E. Horack, *Sutherland's Statutory Construction*, § 5201 *et seq.* (2nd ed. 1943). The Supreme Court has regularly examined statutes bearing on the field regulated by the statute in issue in determining the existence of pre-emptive intent. *DeCanas v. Bica*, 424 U.S. 351, 96 S.Ct. 933, 939, 47 L.Ed.2d 43 (1976).

As stated above, the Consumer Product Safety Commission Improvements Act of 1976 amended FHSA and several other statutes in various ways. Of interest herein is its prescription of functionally uniform pre-emption sections for four statutes administered by the Consumer Product Safety Commission (CPSC)—FHSA, CPSA, the Poison Prevention Packaging Act of 1970, 15 U.S.C. § 1471 *et. seq.* (1970) and the Flammable Fabrics Act, 15 U.S.C. § 1191 et seq. (1970). These pre-emption sections address the concerns which are pressed by plaintiffs. They bar differing state regulations, including labeling regulations, once the CPSC has acted with reference to a specific risk of illness or injury associated with use of a particular product unless an exemption is granted by that agency upon petition by a state. Publ.L. No. 94–284 § 17 (May 11, 1976). An exemption may be granted only if after an administrative hearing, CPSC finds that compliance with the state standard will not result in a violation of the federal requirement; that the state standard provides a substantially higher degree of protection than the federal standard; and that the state standard does not unduly burden interstate commerce. A similar procedure is prescribed under the Toxic Substances Control Act, 15 U.S.C. § 2617 (Supp. VI, 1976), a statute administered by the Environmental Protection Agency (EPA). The court feels that this approach represents the most appropriate response to the factors present in the modern regulatory process—legislative rule-making on a national scale, state attempts to provide a greater degree of protection, and corresponding burdens on interstate manufacturers and producers. As it also represents the most recent congressional response, the court suspects that it would probably be adopted if Congress were once again to legislate with regard to food, drug, and cosmetic products. Thus, although these statutes are by no means controlling, they weigh heavily in the court's analysis of the pre-emption question.

Examination of the pervasiveness of the federal regulatory scheme as effectuated by the responsible administrative agency must proceed on two levels—the pervasiveness of federal regulation as to aerosol labeling in general and pervasiveness with regard to the problem of ozone deterioration. Also, the court must take account of the fact that federal labeling regulation is not merely the province of the FDA but rather is a process involving several agencies with jurisdiction over differing classes of products and with diverse regulatory goals.

As plaintiffs' brief relates, generally the FDA has previously required warnings of hazards other than ozone deterioration and lists of ingredients to be displayed on aerosol products which it regulates. Other agencies have promulgated similar, and in many cases, identical labeling requirements for products over which they have statutory responsibility. With regard to the problem of ozone deterioration in particular, the first federal administrative response was the formation of the interagency task force on the Inadvertent Modification of the Stratosphere. After several months of study, this group, as well as its constituent agencies, requested the National Academy of Sciences to investigate the scientific aspects of the problem in more detail. The task force reviewed the results of this examination and issued its own recommendations which in turn triggered the promulgation of the FDA's as well as other agencies' regulations. 41 F.R. 52072–74 (1976). The Consumer Product Safety Commission

(CPSC) has proposed a warning identical to that required by the FDA. The Environmental Protection Agency (EPA) has required a different label for pesticides, one stating that the product contains chlorofluorocarbons. All three of the agencies are coordinating their prospective bans. 42 F.R. 22020 (1977).

■ Defendants' first rejoinder to these facts is an attempt to characterize these regulatory programs as *ad-hoc*, uncoordinated responses to the agencies' discoveries of dangers in the specific products which they regulate. They point out that federal law is generally interstitial in nature and rarely occupies a legal field completely. On one level, defendants are correct. This court is not prepared to say that sovereigns other than the federal government are barred from regulating product labeling in general, that a state or locality cannot require labels or warnings regarding problems which have not been addressed by the federal government. However, when federal agencies have perceived a specific risk and have required labeling to alleviate that risk, the court feels that a state's freedom to require other than identical labeling with respect to that risk is precluded. This is precisely what has occurred in this case. As to defendants' assertion that the federal administrative response was *ad-hoc* and uncoordinated, the court need only point to the two years of interagency effort which preceded any regulatory action and the coordination of the agencies' remedial programs.

■ It is suggested that the recent case of *DeCanas v. Bica, supra,* put to rest the vague formula that Congress "by occupying the field" has excluded state regulation in the area. In the context of defendants' brief, the court interprets this contention as one questioning the continued validity of the pervasiveness test. *DeCanas* does not eliminate this factor from the pre-emption analysis, it merely requires a greater degree of precision in applying it—a court must specifically delineate the contours of the operative field of federal regulation in examining the pervasiveness question. In

this instance, the court defines the field generally as that of consumer product labeling with the caveat that pre-emption problems do not arise until the responsible federal agencies act with respect to a specific regulatory goal. For the foregoing reasons, the court finds that in the area of ozone deterioration warnings, federal action has been so pervasive as to resolve this factor in favor of a preliminary finding of pre-emption.

■ Defendants also cite *New York Department of Social Services v. Dublino,* 413 U.S. 405, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973) for the proposition that mere complexity of a federal regulatory scheme cannot support a finding of pre-emption. They emphasize that the regulatory scheme at issue here is less complex than that involved in *Dublino.* The simple answer to this assertion is that *Dublino's* holding works both ways—a finding of pre-emption is not precluded merely because the regulatory scheme is not complex. As indicated above, the court rests its preliminary finding of a pervasive regulatory scheme not on any regulatory complexity but on the fact that various federal agencies have coordinated their powers over differing classes of products, the sum of these powers being jurisdiction over almost all products which pose the ozone deterioration risk, in a uniform approach to the problem.

■ Next, the court must consider whether the nature of consumer product labeling requires exclusive federal regulation in order to achieve uniformity vital to national interests. Plaintiffs quote several statements by the Commissioner of the FDA which emphasize the need for a uniform national warning of the ozone deterioration risk posed by the use of chlorofluorocarbons. 42 F.R. 22026 (1977). These statements support the common sense notion that in an economy where goods are distributed on a national level, a subordinate unit of government should not be able to require that an interstate producer create special packaging or manufacture a special product for a limited distribution area once the federal government has acted with

regard to the interest sought to be furthered by the subordinate entity's action. That is, the benefit to be derived from the subordinate's regulation is minimal relative to the costs of segregating and specially treating products bound for the limited geographical area. Of course, this benefit-cost imbalance increases as other subordinate governmental entities enact their own species of regulation.[3] Identical concerns prompted the pre-emption sections of the Consumer Product Safety Commission Improvements Act of 1976 and the Toxic Substances Control Act. 2 U.S.Code Cong. and Admin.News, pp. 1003–05 and 1029–31 (1976) and 4 U.S.Code Cong. and Admin. News, p. 4579 (1976). Therefore, the court concludes that uniformity in labeling is required to meet the dual national goal of the most effective warning at the least possible cost.

■ The parties disagree on a very fundamental level as to whether the state statute stands as an obstacle to the accomplishment and execution of the full purpose and objective of Congress. Plaintiffs characterize the differences in warning placement as irreconcilable. Defendants contend that the statute is merely supplementary to the regulation, and that plaintiffs can easily comply with the two requirements by placing the warning label both on the front of the immediate container and its external packaging. When the aerosol container ap-

pears on the retail shelves within a larger package, the statute's requirement that the warning appear on the immediate container as opposed to the regulations' mandate that it be placed on the container's package raises a practical and philosophical conflict. This conflict is not merely textual, it appears to be the product of differing policy goals—use awareness and purchase awareness. A consumer who purchases a packaged container with only the container bearing the warning is not aware of the chlorofluorocarbon risk until the container is removed for use. The same consumer will become aware of the risk at the point of purchase if the product conforms to the federal requirement of conspicuousness to the normal purchaser. It is no answer to say that the manufacturer can comply with both goals and both requirements by placing a warning on the package and on the container. The responsible administrative agency has determined that the federal policy is purchase awareness and that a policy of use awareness ". . . would require more time and expense and thus cause more disruption." 41 F.R. 52075 (1976). The court concludes that Minnesota's container labeling requirement is an obstacle to full effectuation of the federal purpose.

■ When the statutory front labeling requirement is considered apart from the immediate container requirement, different considerations emerge.[4] Frontal warnings

**3.** The factor of balancing benefits and costs also addresses an underlying concern of defendants which appears at several points in their brief—if a state ban of chlorofluorocarbons is permitted by the FDA, how can the lesser remedy of an allegedly more conspicuous warning be barred? First, the court emphasizes that the question of the appropriateness of state bans and the inappropriateness of differential labeling is one for legislative or administrative resolution. For pre-emption purposes, all the court need note is that the FDA has not imposed a current national ban and has permitted states to do so within their geographical boundaries because such bans are not in conflict with federal policy. 42 F.R. 22026 (1977). Thus, there exist no conflicting actions giving rise to a pre-emption problem. However, the court suspects that state bans are permitted because they more effectively eliminate chlorofluorocarbon emissions than do consumer

warnings. Thus, the benefit to the state is much greater than is the benefit derived from the increment of purchases deterred by the state warning but not by the federal warning. Moreover, the cost to the manufacturer of a ban would seem to be somewhat smaller since it is a relatively simple task to terminate altogether sales of a given product in a given distribution area.

**4.** One consideration which is not relevant is defendants' assertion that the back labeling proposed by some of the plaintiffs would not conform to the federal standard. This is clearly a matter for the FDA's compliance division and is not a dispute to be resolved by this court, at least as a matter of first impression. However, the court notes that plaintiffs' attempt to analogize the ozone warning to the inhalation and flammability warnings which are currently required to be placed on the back

on aerosol products which are not retailed in a larger package would effectuate the federal policy of purchase awareness. However, the FDA considered the advisability of front labeling and in its informed discretion, rejected such a standard in favor of its functionally oriented requirement. 42 F.R. 22027 (1977). Defendants' suggestion that both mandates can be fulfilled by placing the warning on the front of the container is contrary to this administrative determination. An attempt by this court to "second guess" the FDA's decision, as defendants seemingly desire, would violate the judicial function in resolving the preemption question. *Northern States Power Co. v. State of Minnesota*, 320 F.Supp. 172, 174 (D.Minn.1970). The FDA presumably analyzed the countervailing policy considerations and expressly rejected the alternative proposed by defendants. That action was part of a concerted and pervasive federal regulatory scheme and was in furtherance of a federal interest requiring uniformity. The court's inquiry can go no further.

Finally, the court must analyze the only two cases which have addressed the preemption question in the context of the Food, Drug, and Cosmetic Act, *Corn Products Refining Co. v. Eddy*, 249 U.S. 427, 39 S.Ct. 325, 63 L.Ed. 689 (1919) and *Swift and Company, Inc. v. Wickham*, 364 F.2d 241 (2nd Cir. 1966), *cert. denied*, 385 U.S. 1036, 87 S.Ct. 776, 17 L.Ed.2d 683 (1967). *Corn Products* was a challenge to a regulation of the Kansas Board of Health requiring that all proprietary foods bear a label displaying the name and content percentage of each ingredient. The regulations were issued pursuant to a statute identical to the federal statute prohibiting misbranding of foods except that the Kansas statute empowered the Board of Health to require ingredient labeling. The Supreme Court held that the regulations were not pre-empted because Congress had not required ingredient labeling, thus leaving that form of regulation

open to the states. In the present case, Congress, through the responsible administrative agency, has acted with respect to the problem of ozone deterioration. *Swift and Company, Inc.*, as defendants indicate, did not consider the pre-emptive effect of the Food, Drug, and Cosmetic Act. Rather, it relied on *Corn Products* in holding that a statute similar to the Food, Drug, and Cosmetic Act did not pre-empt state regulation. Thus, the precedential value of *Swift and Company, Inc.* is no stronger than that of *Corn Products*.

■ For the foregoing reasons, the court finds that plaintiffs have demonstrated a substantial probability of success at trial with regard to their contention that Minnesota Laws 1977, ch. 373, § 1, subd. 2 is unconstitutional under the Supremacy Clause of the United States Constitution.

II.

Plaintiffs have catalogued, by means of the affidavits of several of their key officers, the numerous forms of irreparable harm which they will suffer if the statute is allowed to operate. Contrary to defendant's assertions, these alleged injuries are not merely the product of the "eleventh hour" nature of this lawsuit.

Plaintiffs have pointed to the enormous set-up costs which they will incur if they are forced to differentially label products bound for Minnesota for the duration of the statute's operation. Plaintiffs' injury is enhanced by their inability to amortize these costs without relatively large increases in their products' retail prices due to the projected 1979 termination of the warning stage of Minnesota's phaseout program. The real possibility that plaintiffs might well cease selling these products in Minnesota prior to the time when they will be forced to desist by reason of the statutory ban serves to distinguish this case from those instances in which injunctive relief

of aerosol containers seemingly misses the point. The latter warnings are use oriented warnings while the ozone warning is intended to diminish chlorofluorocarbon emissions by

deterring purchase of products employing the chemicals as propellants. Different functions would apparently dictate different locations for the warnings.

has been denied because the prospective loss is only monetary. *See, Salsburg's Meats, Inc. v. Shultz*, 363 F.Supp. 269, 272 (E.D.Pa. 1973) and cases cited therein. That is, a cessation of business will not only cause a revenue loss but also loss of consumer good will, disruption of the distribution network, etc. Thus, the court concludes that plaintiffs will suffer irreparable harm absent the issuance of an injunction.

## III.

Since defendants will be acting as *parens patriae* for the citizens of Minnesota in attempting to enforce the statute's public health policies, the final two requirements for a preliminary injunction are functionally equivalent in this case. Thus, they can be discussed as one. The first point to emphasize in analyzing what, if any, damage will occur to the public if the statute is not allowed to take effect is that an injunction will not result in there being no warning at all. The federal requirement of a warning conspicuous at the time of purchase will be operative. Second, the duration of the warning stage of both the federal and state chlorofluorocarbon phaseout programs is approximately eighteen months. Third, the FDA was prompted to initiate its phaseout program by the preliminary finding of the National Academy of Sciences (NAS) that if chlorofluorocarbon emissions were to continue worldwide at 1973 levels, the ultimate final reduction in the atmospheric ozone layer would approximate seven percent. 42 F.R. 22021 (1977). Thus, given that a certain number of Minnesota consumers will not purchase chlorofluorocarbon aerosols because of the federal warning, and given that a small additional number would be deterred from purchase by addition of the state's admonition, it appears that the amount of ozone depletion caused by emissions from containers purchased by this latter group of consumers in the eighteen month period will be only miniscule at best. Consequently, the court finds that the equities tip sharply in favor of plaintiffs.