92 F.3d 67
 24 Media L. Rep. 2089
 INTERNATIONAL DAIRY FOODS ASSOCIATION; Milk Industry
Foundation (MIF); International Ice Cream Association;
National Cheese Institute; Grocery Manufacturers of
America, Inc. and National Food Processors Association,
Plaintiffs-Appellants,
v.
Jeffrey L. AMESTOY, as Attorney General of the State of
Vermont and Leon C. Graves, Commissioner of
Agriculture, Food and Markets of the
State of Vermont, Defendants-Appellees.
 No. 876, Docket 95-7819.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 2, 1995.
Decided Aug. 8, 1996.
 
 Steven J. Rosenbaum, Covington & Burling, Washington, DC (Sarah E. Taylor, Jonathan R. Galst, Covington & Burling, Washington, DC, on the brief), for plaintiffs-appellants.
 Eileen I. Elliott, Assistant Attorney General, Montpelier, Vermont (David M. Rocchio, Assistant Attorney General, Montpelier, Vermont, on the brief), for defendants-appellees.
 Before ALTIMARI, McLAUGHLIN and LEVAL, Circuit Judges.
 ALTIMARI, Circuit Judge:
 
 
 1
 Plaintiffs-appellants International Dairy Foods Association, Milk Industry Foundation (MIF), International Ice Cream Association, National Cheese Institute, Grocery Manufacturers of America, Inc. and National Food Processors Association (collectively "appellants" or "dairy manufacturers") appeal from a decision of the district court (Murtha, C.J.), denying their motion for a preliminary injunction. 898 F.Supp. 246 (D.Vt.1995). The dairy manufacturers challenged the constitutionality of Vt. Stat. Ann. tit. 6, § 2754(c) which requires dairy manufacturers to identify products which were, or might have been, derived from dairy cows treated with a synthetic growth hormone used to increase milk production. The dairy manufacturers alleged that the statute violated the United States Constitution's First Amendment and Commerce Clause.
 
 
 2
 Because we find that the district court abused its discretion in failing to grant preliminary injunctive relief to the dairy manufacturers on First Amendment grounds, we reverse and remand.
 
 Background
 
 3
 The factual background to this case is capably described in the district court's opinion, see 898 F.Supp. 246 (D.Vt.1995). We therefore summarize only those facts necessary to an understanding of our disposition.
 
 
 4
 In 1993, the federal Food and Drug Administration ("FDA") approved the use of recombinant Bovine Somatotropin ("rBST") (also known as recombinant Bovine Growth Hormone ("rGBH")), a synthetic growth hormone that increases milk production by cows. It is undisputed that the dairy products derived from herds treated with rBST are indistinguishable from products derived from untreated herds; consequently, the FDA declined to require the labeling of products derived from cows receiving the supplemental hormone.
 
 
 5
 In April 1994, defendant-appellee the State of Vermont ("Vermont") enacted a statute requiring that "[i]f rBST has been used in the production of milk or a milk product for retail sale in this state, the retail milk or milk product shall be labeled as such." Vt. Stat. Ann. tit. 6, § 2754(c). The State of Vermont's Commissioner of Agriculture ("Commissioner") subsequently promulgated regulations giving those dairy manufacturers who use rBST four labeling options, among them the posting of a sign to the following effect in any store selling dairy products:
 
 
 6
 rBST Information
 
 
 7
 THE PRODUCTS IN THIS CASE THAT CONTAIN OR MAY CONTAIN MILK FROM rBST-TREATED COWS EITHER (1) STATE ON THE PACKAGE THAT rBST HAS BEEN OR MAY HAVE BEEN USED, OR (2) ARE IDENTIFIED BY A BLUE SHELF LABEL LIKE THIS
 
 
 8
 [BLUE RECTANGLE]
 
 
 9
 OR (3) A BLUE STICKER ON THE PACKAGE LIKE THIS. [BLUE DOT]
 
 
 10
 The United States Food and Drug Administration has determined that there is no significant difference between milk from treated and untreated cows. It is the law of Vermont that products made from the milk of rBST-treated cows be labeled to help consumers make informed shopping decisions.
 
 
 11
 (6 V.S.A. Section 2754)
 
 
 12
 Adopted Rules (rBST Notification and Labeling Regulations Relating to Milk and Milk Products) of Vermont Dep't of Agriculture, Food and Markets, § 3.1b ("Vt.Regs."). Failure to comply with the statute and companion regulations subjects manufacturers to civil, see Vt. Stat. Ann. tit. 9, ch. 63 (Consumer Fraud Act), § 2451 et seq. [Add. to Blue Br. 12-13], as well as criminal, see Vt. Stat. Ann. tit. 6, ch. 151 (Supervision, Inspection and Licensing of Dairy Operations), § 2671 et seq., penalties.
 
 
 13
 Appellants filed suit in April 1994, asserting that the statute was unconstitutional. In June 1995, the dairy manufacturers moved for preliminary injunctive relief, seeking to enjoin enforcement of the statute. The dairy manufacturers alleged that the Vermont statute (1) infringed their protected rights under the First Amendment to the Constitution and (2) violated the Constitution's Commerce Clause, U.S. Const., Art. 1, § 8. Following an extensive hearing, the United States District Court for the District of Vermont (Murtha, C.J.), denied appellants' motion. See 898 F.Supp. at 254. The dairy manufacturers now appeal.
 
 
 14
 Because we find that the dairy manufacturers are entitled to an injunction on First Amendment grounds, we do not reach their claims made pursuant to the Commerce Clause.
 
 Discussion
 
 15
 Generally, preliminary injunctive relief is appropriate when the movant shows "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir.1979) (per curiam); see also Union Carbide Agr. Prods. Co. v. Costle, 632 F.2d 1014, 1017 (2d Cir.1980) ("Before a preliminary injunction will be granted in this Circuit, it must pass one of two tests. Both require a showing of irreparable harm."), cert. denied, 450 U.S. 996, 101 S.Ct. 1698, 68 L.Ed.2d 196 (1981). However, because the injunction at issue stays "government action taken in the public interest pursuant to a statutory ... scheme," this Court has determined that the movant must satisfy the more rigorous "likelihood of success prong." Able v. United States, 44 F.3d 128, 131-32 (2d Cir.1995); see Plaza Health Laboratories, Inc. v. Perales, 878 F.2d 577, 580 (2d Cir.1989).
 
 
 16
 We review the district court's denial of a preliminary injunction for an abuse of discretion, see Coca-Cola Co. v. Tropicana Prods., Inc., 690 F.2d 312, 315 (2d Cir.1982), and will reverse the district court only if it relied on clearly erroneous findings of fact, misapprehended the law, or erred in formulating the injunction, see Blum v. Schlegel, 18 F.3d 1005, 1010 (2d Cir.1994).
 
 1. Irreparable Harm
 
 17
 Focusing principally on the economic impact of the labeling regulation, the district court found that appellants had not demonstrated irreparable harm to any right protected by the First Amendment. We disagree.
 
 
 18
 Irreparable harm is "injury for which a monetary award cannot be adequate compensation." See Jackson Dairy, Inc., 596 F.2d at 72. It is established that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976); see Paulsen v. County of Nassau, 925 F.2d 65, 68 (2d Cir.1991) ("[s]ince prohibitions on leafletting and dissemination of religious views contravene core First Amendment values" irreparable harm necessarily established); Deeper Life Christian Fellowship, Inc. v. Board of Ed., 852 F.2d 676, 679 (2d Cir.1988) (depriving church of location for religious services for substantial period of time constituted irreparable harm). Because the statute at issue requires appellants to make an involuntary statement whenever they offer their products for sale, we find that the statute causes the dairy manufacturers irreparable harm.
 
 
 19
 Quoting Hohe v. Casey, 868 F.2d 69, 72-73 (3d Cir.), cert. denied, 493 U.S. 848, 110 S.Ct. 144, 107 L.Ed.2d 102 (1989), the district court rejected this claim, stating that:
 
 
 20
 "the assertion of First Amendment rights does not automatically require a finding of irreparable injury, thus entitling a plaintiff to a preliminary injunction if he shows a likelihood of success on the merits." 868 F.2d at 72-73.
 
 
 21
 Ordinarily, it is the purposeful suppression of speech which constitutes irreparable harm. Compliance with the Vermont Labeling Law does not prohibit the plaintiffs from disseminating a message. Instead, it requires the plaintiffs to truthfully disclose the method used in producing their product. Under these circumstances, the Court does not find that the plaintiffs' assertion of a First Amendment violation leads ineluctably to the conclusion that they will suffer irreparable harm.
 
 
 22
 898 F.Supp. at 251-52 (citations omitted).
 
 
 23
 We conclude, however, that the manufacturers have carried their burden of establishing irreparable harm. The wrong done by the labeling law to the dairy manufacturers' constitutional right not to speak is a serious one that was not given proper weight by the district court. See Wooley v. Maynard, 430 U.S. 705, 714, 97 S.Ct. 1428, 1435, 51 L.Ed.2d 752 (1977) ("We begin with the proposition that the right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all."); West Virginia State Bd. of Ed. v. Barnette, 319 U.S. 624, 633, 63 S.Ct. 1178, 1183, 87 L.Ed. 1628 (1943) ("involuntary affirmation could be commanded only on even more immediate and urgent grounds than silence"); see also Harper & Row, Publishers, Inc. v. Nation Enter., 471 U.S. 539, 559, 105 S.Ct. 2218, 2230, 85 L.Ed.2d 588 (1985) (recognizing, along with freedom to express one's views publicly, " 'concomitant freedom not to speak publicly' ") (quoting Estate of Hemingway v. Random House, Inc., 23 N.Y.2d 341, 348, 296 N.Y.S.2d 771, 778, 244 N.E.2d 250, 255 (1968)).
 
 
 24
 The right not to speak inheres in political and commercial speech alike, see Zauderer v. Office of Disciplinary Counsel, 471 U.S. 626, 651, 105 S.Ct. 2265, 2281-82, 85 L.Ed.2d 652 (1985); cf. National Comm'n on Egg Nutrition v. Federal Trade Comm'n, 570 F.2d 157, 160 (7th Cir.1977), cert. denied, 439 U.S. 821, 99 S.Ct. 86, 58 L.Ed.2d 113 (1978), and extends to statements of fact as well as statements of opinion, see Riley v. National Federation of the Blind, 487 U.S. 781, 797-98, 108 S.Ct. 2667, 2677-78, 101 L.Ed.2d 669 (1988). If, however, as Vermont maintains, its labeling law compels appellants to engage in purely commercial speech, the statute must meet a less rigorous test. See Central Hudson Gas & Elec. Corp. v. Public Serv. Commission, 447 U.S. 557, 562-63, 100 S.Ct. 2343, 2350, 65 L.Ed.2d 341 (1980) ("The Constitution ... accords a lesser protection to commercial speech than to other constitutionally guaranteed expression."). The dairy manufacturers insist that the speech is not purely commercial because it compels them "to convey a message regarding the significance of rBST use that is 'expressly contrary to' their views." [Blue br. at 21] (quoting Pacific Gas & Elec. Co. v. Public Utilities Comm'n, 475 U.S. 1, 16 n. 12, 106 S.Ct. 903, 911 n. 12, 89 L.Ed.2d 1 (1986) (plurality)). Agreeing with Vermont, the district court found that the speech was commercial in nature. See 898 F.Supp. at 253.
 
 
 25
 We need not resolve this controversy at this point; even assuming that the compelled disclosure is purely commercial speech, appellants have amply demonstrated that the First Amendment is sufficiently implicated to cause irreparable harm. See, e.g., Cal-Almond, Inc. v. United States Dep't of Agriculture, 14 F.3d 429, 434, (9th Cir.1993) (First Amendment implicated by mandatory assessment on almond handlers to fund almond marketing program); United States v. Frame, 885 F.2d 1119, 1132-33 (3d Cir.1989) (federal Beef Promotion & Research Act implicated beef producer's right to refrain from speaking because it required that producer help fund commercial message to which producer did not necessarily subscribe), cert. denied, 493 U.S. 1094, 110 S.Ct. 1168, 107 L.Ed.2d 1070 (1990). Cf. National Comm'n on Egg Nutrition, 570 F.2d at 164 (modifying remedial order provision that required egg producers "to argue the other side of the controversy, thus interfering unnecessarily with the effective presentation of the pro-egg position."). The dairy manufacturers have clearly done more than simply "assert" their First Amendment rights: The statute in question indisputably requires them to speak when they would rather not. See 898 F.Supp. at 251-52. Because compelled speech "contravene[s] core First Amendment values," appellants have "satisfied the initial requirement for securing injunctive relief." Paulsen, 925 F.2d at 68.
 
 
 26
 In our view, Hohe v. Casey, 868 F.2d 69, 69 (3d Cir.), cert. denied, 493 U.S. 848, 110 S.Ct. 144, 107 L.Ed.2d 102 (1989), relied on by the district court, is not to the contrary. There, the Third Circuit held that the collection of fair share fees from non-Union members did not constitute irreparable harm. 868 F.2d at 73. However, the constitutional injury alleged in Hohe bears little resemblance to the compelled speech at issue here; the non-Union members alleged that the deduction of fees from their compensation deprived them "of money they might use to support their own political, ideological, or other purposes." Id. As the Third Circuit found, monetary damages or restitution could remedy that ill. Id. More importantly, Hohe is distinct from the case at hand in that the Vermont statute certainly results in "the 'direct penalization, as opposed to incidental inhibition, of First Amendment rights [which] constitutes irreparable injury.' " Hohe, 868 F.2d at 73 (quoting Cate v. Oldham, 707 F.2d 1176, 1188 (11th Cir.1983)).
 
 
 27
 Because the statute at hand unquestionably implicates the dairy manufacturers' speech rights, we reject the district court's conclusion that the disclosure compelled by Vt. Stat. Ann. tit. 6, § 2754(c), is not a "loss of First Amendment freedoms," Elrod, 427 U.S. at 373, 96 S.Ct. at 2690, amounting to irreparable harm.
 
 2. Likelihood of Success on the Merits
 
 28
 It is not enough for appellants to show, as they have, that they were irreparably harmed by the statute; because the dairy manufacturers challenge government action taken in the public interest, they must also show a likelihood of success on the merits. We find that such success is likely.
 
 
 29
 In Central Hudson, the Supreme Court articulated a four-part analysis for determining whether a government restriction on commercial speech is permissible. 447 U.S. at 566, 100 S.Ct. at 2351. We need not address the controversy concerning the nature of the speech in question--commercial or political--because we find that Vermont fails to meet the less stringent constitutional requirements applicable to compelled commercial speech.
 
 
 30
 Under Central Hudson, we must determine: (1) whether the expression concerns lawful activity and is not misleading; (2) whether the government's interest is substantial; (3) whether the labeling law directly serves the asserted interest; and (4) whether the labeling law is no more extensive than necessary. See id.; see also Edenfield v. Fane, 507 U.S. 761, 766-67, 113 S.Ct. 1792, 1798, 123 L.Ed.2d 543 (1993). Furthermore, the State of Vermont bears the burden of justifying its labeling law. See Edenfield, 507 U.S. at 770-71, 113 S.Ct. at 1800; Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 71 n. 20, 103 S.Ct. 2875, 2882 n. 20, 77 L.Ed.2d 469 (1983). As the Supreme Court has made clear, "[t]his burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." Edenfield, 507 U.S. at 770-71, 113 S.Ct. at 1800; see also Ibanez v. Florida Dep't of Business and Prof. Reg., Board of Accountancy, 512 U.S. 136, ----, 114 S.Ct. 2084, 2089, 129 L.Ed.2d 118 (1994) ("State's burden is not slight").
 
 
 31
 In our view, Vermont has failed to establish the second prong of the Central Hudson test, namely that its interest is substantial. In making this determination, we rely only upon those interests set forth by Vermont before the district court. See Edenfield, 507 U.S. at 766-67, 113 S.Ct. at 1798 ("[T]he Central Hudson standard does not permit us to supplant the precise interests put forward by the State with other suppositions."). As the district court made clear, Vermont "does not claim that health or safety concerns prompted the passage of the Vermont Labeling Law," but instead defends the statute on the basis of "strong consumer interest and the public's 'right to know'...." 898 F.Supp. at 249. These interests are insufficient to justify compromising protected constitutional rights.[1]
 
 
 32
 Vermont's failure to defend its constitutional intrusion on the ground that it negatively impacts public health is easily understood. After exhaustive studies, the FDA has "concluded that rBST has no appreciable effect on the composition of milk produced by treated cows, and that there are no human safety or health concerns associated with food products derived from cows treated with rBST." 898 F.Supp. at 248. Because bovine somatotropin ("BST") appears naturally in cows, and because there are no BST receptors in a cow's mammary glands, only trace amounts of BST can be detected in milk, whether or not the cows received the supplement. Id. Moreover, it is undisputed that neither consumers nor scientists can distinguish rBST-derived milk from milk produced by an untreated cow. Id. at 248-49. Indeed, the already extensive record in this case contains no scientific evidence from which an objective observer could conclude that rBST has any impact at all on dairy products. It is thus plain that Vermont could not justify the statute on the basis of "real" harms. See Edenfield, 507 U.S. at 770-71, 113 S.Ct. at 1800.
 
 
 33
 We do not doubt that Vermont's asserted interest, the demand of its citizenry for such information, is genuine; reluctantly, however, we conclude that it is inadequate. We are aware of no case in which consumer interest alone was sufficient to justify requiring a product's manufacturers to publish the functional equivalent of a warning about a production method that has no discernable impact on a final product. See, e.g., Ibanez, 512 U.S. at ----, 114 S.Ct. at 2090 (invalidating state requirement that Certified Financial Planner ("CFP") disclose in advertisement that CFP status was conferred by unofficial private organization despite unsubstantiated claim that public might otherwise be misled by CFP's advertisement). Cf. Riley, 487 U.S. at 797-98, 108 S.Ct. at 2677-78 (holding unconstitutional state requirement that professional fundraisers disclose to prospective donors factual information concerning the percentage of contributions actually passed on to charities notwithstanding the fact that prospective donors might find the truthful information relevant and persuasive).
 
 
 34
 Although the Court is sympathetic to the Vermont consumers who wish to know which products may derive from rBST-treated herds, their desire is insufficient to permit the State of Vermont to compel the dairy manufacturers to speak against their will. Were consumer interest alone sufficient, there is no end to the information that states could require manufacturers to disclose about their production methods. For instance, with respect to cattle, consumers might reasonably evince an interest in knowing which grains herds were fed, with which medicines they were treated, or the age at which they were slaughtered. Absent, however, some indication that this information bears on a reasonable concern for human health or safety or some other sufficiently substantial governmental concern, the manufacturers cannot be compelled to disclose it. Instead, those consumers interested in such information should exercise the power of their purses by buying products from manufacturers who voluntarily reveal it.
 
 
 35
 Accordingly, we hold that consumer curiosity alone is not a strong enough state interest to sustain the compulsion of even an accurate, factual statement, see Riley, 487 U.S. at 797-98, 108 S.Ct. at 2677-78 (compelled disclosure of "fact" is no more acceptable than compelled disclosure of opinion), in a commercial context. See, e.g., United States v. Sullivan, 332 U.S. 689, 693, 68 S.Ct. 331, 334, 92 L.Ed. 297 (1948) (upholding federal law requiring warning labels on "harmful foods, drugs and cosmetics") (emphasis added); see also Zauderer, 471 U.S. at 651, 105 S.Ct. at 2282 (disclosure requirements are permissible "as long as [they] are reasonably related to the State's interest in preventing deception of consumers."); In re R.M.J., 455 U.S. 191, 201, 102 S.Ct. 929, 936, 71 L.Ed.2d 64 (1982) ("warning[s] or disclaimer[s] might be appropriately required ... in order to dissipate the possibility of consumer confusion or deception."); Bates v. State Bar of Arizona, 433 U.S. 350, 384, 97 S.Ct. 2691, 2709, 53 L.Ed.2d 810 (1977) (state bar association could not ban advertising that was neither misleading nor deceptive); Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 771-72, 96 S.Ct. 1817, 1830-31, 48 L.Ed.2d 346 (1975) (regulation aimed at preventing deceptive or misleading commercial speech would be permissible). Because Vermont has demonstrated no cognizable harms, see Edenfield, 507 U.S. at 770-71, 113 S.Ct. at 1800, its statute is likely to be held unconstitutional.
 
 Conclusion
 
 36
 Because appellants have demonstrated both irreparable harm and a likelihood of success on the merits, the judgment of the district court is reversed, and the case is remanded for entry of an appropriate injunction.
 
 LEVAL, Circuit Judge, dissenting:
 
 37
 I respectfully dissent. Vermont's regulation requiring disclosure of use of rBST in milk production was based on substantial state interests, including worries about rBST's impact on human and cow health, fears for the survival of small dairy farms, and concerns about the manipulation of nature through biotechnology. The objective of the plaintiff milk producers is to conceal their use of rBST from consumers. The policy of the First Amendment, in its application to commercial speech, is to favor the flow of accurate, relevant information. The majority's invocation of the First Amendment to invalidate a state law requiring disclosure of information consumers reasonably desire stands the Amendment on its ear. In my view, the district court correctly found that plaintiffs were unlikely to succeed in proving Vermont's law unconstitutional.[1]
 
 Background
 
 38
 Because many of the most important facts of this case are omitted from the majority's opinion, I briefly review the facts.
 
 
 39
 Recent advances in genetic technologies led to the development of a synthetically isolated metabolic protein hormone known as recombinant bovine somatotropin (rBST), which, when injected into cows, increases their milk production. Monsanto Company, an amicus in this action on the side of the plaintiff milk producers, has developed the only commercially approved form of rBST and markets it under the brand name "Posilac." This is, of course, at the frontiers of bio-science. A 1994 federal government study of rBST describes it as "one of the first major commercial biotechnology products to be used in the U.S. food and agricultural sector and the first to attract significant attention." Executive Branch of the Federal Government, Use of Bovine Somatotropin (BST) in the United States: Its Potential Effects (January 1994) [hereafter "Federal Study"], at 58.
 
 
 40
 The United States Food and Drug Administration ("FDA") and others have studied rBST extensively. Based on its study, the FDA authorized commercial use of rBST on November 5, 1993, concluding that "milk and meat from [rBST-treated] cows is safe" for human consumption.
 
 
 41
 The impending use of rBST caused substantial controversy throughout the country. The Federal Study reports, based on numerous surveys, that consumers favor the labeling of milk produced by use of rBST. Federal Study at 39-40. In Vermont, a state highly attuned to issues affecting the dairy industry, use of rBST was the subject of frequent press commentary and debate, and provoked considerable opposition. In response to public pressure, the state of Vermont enacted a law requiring that "[i]f rBST has been used in the production of milk or a milk product for retail sale in this state, the retail milk or milk product shall be labeled as such." 6 V.S.A. § 2754(c). The statute authorized Vermont's Commissioner of Agriculture to adopt implementing rules. Id. at § 2754(d). The Department of Agriculture, Food and Markets (hereafter "the Agriculture Department") proceeded to adopt the regulations described in the majority opinion, which essentially require manufacturers to identify dairy products produced with rBST with a blue dot, and retailers to display a sign telling consumers that the blue-dotted products "contain milk from rBST-treated cows" and that the FDA "has determined that there is no significant difference between milk from treated and untreated cows." The sign concludes that the law of Vermont requires that the information be given "to help consumers make informed shopping decisions."
 
 
 42
 The interests which Vermont sought to advance by its statute and regulations were explained in the Agriculture Department's Economic Impact Statement accompanying its regulations. The Statement reported that consumer interest in disclosure of use of rBST was based on "concerns about FDA determinations about the product as regards health and safety or about recombinant gene technology"; concerns "about the effect of the product on bovine health"; and "concerns about the effect of the product on the existing surplus of milk and in the dairy farm industry's economic status and well-being." This finding was based on "consumer comments to Vermont legislative committees" and to the Department, as well as published reports and letters to the editors published in the press.
 
 
 43
 The state offered survey evidence which demonstrated similar public concern. Comments by Vermont citizens who had heard or read about rBST were overwhelmingly negative. The most prevalent responses to rBST use included: "Not natural," "More research needs to be done/Long-term effects not clear," "Against additives added to my milk," "Worried about adverse health effects," "Unhealthy for the cow," "Don't need more chemicals," "It's a hormone/Against hormones added to my milk," "Hurts the small dairy farmer," "Producing enough milk already."
 
 
 44
 On the basis of this evidence the district court found that a majority of Vermonters "do not want to purchase milk products derived from rBST-treated cows," International Dairy Foods Ass'n v. Amestoy, 898 F.Supp. 246, 250 (D.Vt.1995) (hereafter "IDFA "), and that the reasons included:
 
 
 45
 (1) They consider the use of a genetically-engineered hormone in the production unnatural; (2) they believe that use of the hormone will result in increased milk production and lower milk prices, thereby hurting small dairy farmers; (3) they believe that the use of rBST is harmful to cows and potentially harmful to humans; and, (4) they feel that there is a lack of knowledge regarding the long-term effects of rBST.
 
 
 46
 Id. The court thus understandably concluded that "Vermont has a substantial interest in informing consumers of the use of rBST in the production of milk and dairy products sold in the state." Id. at 254.
 
 Discussion
 A. The Majority Opinion
 
 47
 In the face of this evidence and these explicit findings by the district court, the majority oddly concludes that Vermont's sole interest in requiring disclosure of rBST use is to gratify "consumer curiosity," and that this alone "is not a strong enough state interest to sustain the compulsion of even an accurate factual statement." Maj. Op. at 74. The majority seeks to justify its conclusion in three ways.
 
 
 48
 First, it simply disregards the evidence of Vermont's true interests and the district court's findings recognizing those interests. Nowhere does the majority opinion discuss or even mention the evidence or findings regarding the people of Vermont's concerns about human health, cow health, biotechnology, and the survival of small dairy farms.
 
 
 49
 Second, the majority distorts the meaning of the district court opinion. It relies substantially on Judge Murtha's statement that Vermont "does not claim that health or safety concerns prompted the passage of the Vermont Labeling Law," but "bases its justification ... on strong consumer interest and the public's 'right to know'." IDFA, 898 F.Supp. at 249; Maj. Op. at 73. The majority takes this passage out of context. The district court's opinion went on, as quoted above, to explain the concerns that underlie the interest of Vermont's citizenry. Unquestionably the district court found, and the evidence showed, that the interests of the citizenry that led to the passage of the law include health and safety concerns, among others. In the light of the district judge's further explicit findings, it is clear that his statement could not mean what the majority concludes.[2] More likely, what Judge Murtha meant was that Vermont does not claim to know whether rBST is harmful. And when he asserted that Vermont's rule was passed to vindicate "strong consumer interest and the public's right to know," this could not mean that the public's interest was based on nothing but "curiosity," because the judge expressly found that the consumer interest was based on health, economic, and ethical concerns.
 
 
 50
 Third, the majority suggests that, because the FDA has not found health risks in this new procedure, health worries could not be considered "real" or "cognizable." Maj. Op. at 73-74. I find this proposition alarming and dangerous; at the very least, it is extraordinarily unrealistic. Genetic and biotechnological manipulation of basic food products is new and controversial. Although I have no reason to doubt that the FDA's studies of rBST have been thorough, they could not cover long-term effects of rBST on humans.[3] Furthermore, there are many possible reasons why a government agency might fail to find real health risks, including inadequate time and budget for testing, insufficient advancement of scientific techniques, insufficiently large sampling populations, pressures from industry, and simple human error. To suggest that a government agency's failure to find a health risk in a short-term study of a new genetic technology should bar a state from requiring simple disclosure of the use of that technology where its citizens are concerned about such health risks would be unreasonable and dangerous. Although the FDA's conclusions may be reassuring, they do not guarantee the safety of rBST.
 
 
 51
 Forty years ago, when I (and nearly everyone) smoked, no one told us that we might be endangering our health. Tobacco is but one of many consumer products once considered safe, which were subsequently found to cause health hazards. The limitations of scientific information about new consumer products were well illustrated in a 1990 study produced at the request of Congress by the General Accounting Office. Looking at various prescription drugs available on the market, the study examined the risks associated with the drugs that became known only after they were approved by the FDA, and concluded:
 
 
 52
 [E]ven after approval, many additional risks may surface when the general population is exposed to a drug. These risks, which range from relatively minor (such as nausea and headache) to serious (such as hospitalization and death) arise from the fact that preapproval drug testing is inherently limited.
 
 
 53
 ....
 
 
 54
 In studying the frequency and seriousness of risks identified after approval, GAO found that of the 198 drugs approved by FDA between 1976 and 1985 for which data were available, 102 (or 51.5 percent) had serious post-approval risks, as evidenced by labeling changes or withdrawal from the market. All but six of these drugs ... are deemed by FDA to have benefits that outweigh their risks. The serious post-approval risks are adverse reactions that could lead to hospitalization ... severe or permanent disability, or death.
 
 
 55
 GAO Report, "FDA Drug Review: Postapproval Risks, 1976-85," April 1990, at 2-3. As startling as its results may seem, this study merely confirms a common sense proposition: namely, that a government agency's conclusion regarding a product's safety, reached after limited study, is not a guarantee and does not invalidate public concern for unknown side effects.
 
 
 56
 In short, the majority has no valid basis for its conclusion that Vermont's regulation advances no interest other than the gratification of consumer curiosity, and involves neither health concerns nor other substantial interests.
 
 B. Substantial State Interests
 
 57
 Freedom of speech is not an absolute right, particularly in the commercial context. In Central Hudson Gas v. Public Service Comm'n of New York, 447 U.S. 557, 566, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341 (1980), the Supreme Court announced standards for governmental regulation of commercial speech. At the outset, commercial speech enjoys no First Amendment protection at all unless it is not misleading (and relates to lawful activity). If the speech passes that test, it is nonetheless subject to regulation if the government has a substantial interest in regulating the speech, the regulation directly advances that interest, and it is no more intrusive than necessary to accomplish its goal. 447 U.S. at 566, 100 S.Ct. at 2351. The Supreme Court later clarified that government's power to regulate commercial speech includes the power to compel such speech. Zauderer v. Office of Disciplinary Counsel, 471 U.S. 626, 651, 105 S.Ct. 2265, 2281-82, 85 L.Ed.2d 652 (1985) (upholding state law requiring attorneys who advertised contingent fee services to disclose specific details about how contingent fee would be calculated and to state that certain costs might be borne by the client even in the event of loss).
 
 
 58
 Except for its conclusion that Vermont had no substantial interest to support its labeling law, the majority finds no fault with the district court's application of these governing standards. Nor do I. Accordingly, the sole issue is whether Vermont had a substantial interest in compelling the disclosure of use of rBST in milk production.
 
 
 59
 In my view, Vermont's multifaceted interest, outlined above, is altogether substantial. Consumer worries about possible adverse health effects from consumption of rBST, especially over a long term, is unquestionably a substantial interest. As to health risks to cows, the concern is supported by the warning label on Posilac, which states that cows injected with the product are at an increased risk for: various reproductive disorders, "clinical mastitis [udder infections] (visibly abnormal milk)," "digestive disorders such as indigestion, bloat, and diarrhea," "enlarged hocks and lesions," and "swellings" that may be permanent. As to the economic impact of increased milk production, caused by injection of rBST, upon small dairy farmers, the evidence included a U.S. Department of Agriculture economist's written claim that, "if rBST is heavily adopted and milk prices are reduced, at least some of the smaller farmers that do not use rBST might be forced out of the dairy business, because they would not be producing economically sufficient volumes of milk." Public philosophical objection to biotechnological mutation is familiar and widespread.
 
 
 60
 Any one of these concerns may well suffice to make Vermont's interest substantial; all four, taken together, undoubtedly constitute a substantial governmental justification for Vermont's labeling law.
 
 
 61
 Indeed, the majority does not contend otherwise. Nowhere does the majority assert that these interests are not substantial. As noted above, the majority justifies its conclusion of absence of a substantial interest by its assertion that Vermont advanced no interest other than consumer curiosity, a conclusion that is contradicted by both the record and the district court's findings.
 
 
 62
 The Supreme Court has upheld governmental impositions on commercial speech in numerous instances where the governmental interest was no more substantial than those advanced here by Vermont. See Florida Bar v. Went For It, Inc., --- U.S. ----, ----, 115 S.Ct. 2371, 2376, 132 L.Ed.2d 541 (1995) (upholding 30-day waiting period for lawyers' solicitation of business from accident victims because of state's interests in promoting privacy and tranquility); United States v. Edge Broadcasting Co., 509 U.S. 418, 425-26, 113 S.Ct. 2696, 2703, 125 L.Ed.2d 345 (1993) (recognizing federal government's interest in supporting certain states' restrictions on gambling as substantial enough to support a ban on radio broadcast of lottery advertisements in states that prohibit lotteries); Zauderer, 471 U.S. at 650-53, 105 S.Ct. at 2281-82; see also City of Cincinnati v. Discovery Network, 507 U.S. 410, 416, 113 S.Ct. 1505, 1509-10, 123 L.Ed.2d 99 (1993) (safety and aesthetics conceded to be substantial interests supporting law regulating commercial handbill distribution on public property, although the law was struck down on other grounds).
 
 C. Plaintiffs' Contentions
 
 63
 Plaintiffs rely on invalid arguments and authorities that are easily distinguishable. In Ibanez v. Florida Dep't of Business & Professional Regulation, 512 U.S. 136, 114 S.Ct. 2084, 129 L.Ed.2d 118 (1994), the Supreme Court struck down a disciplinary sanction based on a law requiring one who advertised as a "Certified Financial Planner" to disclose in the advertising that her certification came from an unofficial private organization, rather than from the state. The Court found the state's purported interest--the likelihood of consumer confusion--to be "purely hypothetical." Id. at ----, 114 S.Ct. at 2090. Plaintiffs contend that Vermont's health concerns are similarly "hypothetical" because there is no demonstrated health risk in rBST. This misreads the Supreme Court's meaning. The point in Ibanez was that there was no demonstration that Florida's citizenry was confused or cared whether a financial planner's certification was from a private organization or the state. Here, it was clearly shown that Vermont's citizens want rBST disclosure.[4]
 
 
 64
 Plaintiffs also rely on Riley v. National Fed'n of the Blind, 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988). In Riley the Court struck down a state law requiring professional charitable fund raisers to disclose to potential donors the percentage of their collections (in the past year) that actually went to the charity. The compelled speech was deemed not commercial because it was "inextricably intertwined with otherwise fully protected speech"--the solicitation of funds for the client charitable institution. 487 U.S. at 796, 108 S.Ct. at 2677. For this reason, the speech fell under the test for "fully protected speech," rather than under the more limited protection for commercial speech.
 
 
 65
 The milk producers argue that because the sign which Vermont's law requires retailers to post goes beyond disclosure of rBST use and makes statements about it, they, like the fund raisers in Riley, are entitled to the full protection of the First Amendment, rather than the more limited protection afforded to commercial speech. They contend that the disclosure required of them is "inextricably intertwined" with fully protected speech. Riley, 487 U.S. at 796, 108 S.Ct. at 2677. Because the blue dot they affix to their milk containers is linked to the sign retailers post in the stores, they also contend they are forced to subscribe to a message on that sign with which they do not agree. See Pacific Gas & Elec. Co. v. Public Utils. Comm'n, 475 U.S. 1, 15, 106 S.Ct. 903, 911, 89 L.Ed.2d 1 (1986) (striking down regulation requiring utility to include, in its envelope to customers, message of opposition policy group).
 
 
 66
 This argument is merely a contrivance. In the first place, apart from disclosing use of rBST, Vermont's law imposes no speech requirements on the plaintiff milk producers. It is the retailers who are obligated to post signs containing text that relates to the rBST process. Agriculture Department Rules ("rBST Notification and Labeling Regulations Relating to Milk and Milk Products") § 3.3i. No reasonable consumer would understand the signs as constituting any statement by the milk producers. Cf. PruneYard Shopping Ctr. v. Robins, 447 U.S. 74, 99, 100 S.Ct. 2035, 2050, 64 L.Ed.2d 741 (1980)(Powell, J., concurring) (First Amendment concerns arise when it is likely that public might identify speech of one party as that of another).
 
 
 67
 Second, the text posted by retailers under Vermont's law is innocuous. Apart from enabling the consumer to tell which products derive from rBST-treated cows, the only additional required text states:
 
 
 68
 The United States Food and Drug Administration has determined that there is no significant difference between milk from treated and untreated cows. It is the law of Vermont that products made from the milk of rBSt-treated cows be labeled to help consumers make informed shopping decisions.
 
 
 69
 The producers cannot contend they disagree with the first sentence, whose only function is to reassure consumers that the FDA found no health hazard in rBST products.[5] They focus rather on the second sentence, asserting that they disagree with the proposition that "informed shopping decisions" are advanced by disclosure of rBST treatment because they contend it is irrelevant to any legitimate consumer concern. Their argument has no force. The "informed shopping decisions" statement is clearly identified as made by the state of Vermont, not by the milk producers. Furthermore, the statement is virtually meaningless and harmless, especially following the sentence stating that the FDA found no significant difference between milk from treated and untreated cows. The producers cannot even contend that they are obligated by Vermont's regulation to enter into debate. Cf. Pacific Gas, 475 U.S. at 15-16, 106 S.Ct. at 911.
 
 
 70
 It is quite clear that the producers' real objection is to the mandatory revelation of the use of rBST, which many Vermonters disfavor, and not to the bland sentence announcing that products are labeled "to help consumers make informed shopping decisions."
 
 D. Disclosure v. Concealment
 
 71
 Notwithstanding their self-righteous references to free expression, the true objective of the milk producers is concealment. They do not wish consumers to know that their milk products were produced by use of rBST because there are consumers who, for various reasons, prefer to avoid rBST. Vermont, on the other hand, has established a labeling requirement whose sole objective (and whose sole effect) is to inform Vermont consumers whether milk products offered for sale were produced with rBST.[6] The dispute under the First Amendment is over whether the milk producers' interest in concealing their use of rBST from consumers will prevail over a state law designed to give consumers the information they desire. The question is simply whether the First Amendment prohibits government from requiring disclosure of truthful relevant information to consumers.
 
 
 72
 In my view, the interest of the milk producers has little entitlement to protection under the First Amendment. The caselaw that has developed under the doctrine of commercial speech has repeatedly emphasized that the primary function of the First Amendment in its application to commercial speech is to advance truthful disclosure--the very interest that the milk producers seek to undermine.
 
 
 73
 In Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), the Court struck down a provision of the Virginia Code that essentially barred pharmacists, on the grounds of professional ethics, from advertising their prices. The Court noted society's "strong interest in the free flow of commercial information." 425 U.S. at 764, 96 S.Ct. at 1827. Against Virginia's argument that advertisements of low-cost pharmaceutical products would blind consumers to the likelihood that low prices would be accompanied by low-quality pharmaceutical service, the Court said, "It is precisely this kind of choice, between the dangers of suppressing information, and the dangers of its misuse if it is freely available, that the First Amendment makes for us. Virginia is free to require whatever professional standards it wishes of its pharmacists.... But it may not do so by keeping the public in ignorance...." Id. at 770, 96 S.Ct. at 1829.[7]
 
 
 74
 In the most recent term, in 44 Liquormart, Inc. v. Rhode Island, --- U.S. ----, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996), the Court struck down a state law that prohibited liquor dealers from advertising their prices. Citing Virginia Pharmacy Bd., the Court emphasized that the interest protected by the First Amendment's application to commercial speech is "the public's interest in receiving accurate commercial information." Id. at ----, 116 S.Ct. at 1505. The Court explained that "When a State ... requires the disclosure of beneficial consumer information, the purpose of its regulation is consistent with the reasons for according constitutional protection to commercial speech." Id. at ----, 116 S.Ct. at 1507.[8]
 
 
 75
 In Zauderer, the Court stressed the "material differences between disclosure requirements and outright prohibitions on speech." 471 U.S. at 650, 105 S.Ct. at 2281. It concluded that "[b]ecause the extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides, appellant's constitutionally protected interest in not providing any particular factual information in his advertising is minimal.... [D]isclosure requirements trench much more narrowly on an advertiser's interests than do flat prohibitions on speech...." 471 U.S. at 651, 105 S.Ct. at 2282 (citations omitted).
 
 
 76
 The application of these principles to the case at bar yields a clear message. The benefit the First Amendment confers in the area of commercial speech is the provision of accurate, non-misleading, relevant information to consumers. Thus, regulations designed to prevent the flow of such information are disfavored; regulations designed to provide such information are not.
 
 
 77
 The milk producers' invocation of the First Amendment for the purpose of concealing their use of rBST in milk production is entitled to scant recognition. They invoke the Amendment's protection to accomplish exactly what the Amendment opposes. And the majority's ruling deprives Vermont of the right to protect its consumers by requiring truthful disclosure on a subject of legitimate public concern.
 
 
 78
 * * *
 
 
 79
 I am comforted by two considerations: First, the precedential effect of the majority's ruling is quite limited. By its own terms, it applies only to cases where a state disclosure requirement is supported by no interest other than the gratification of consumer curiosity. In any case in which a state advanced something more, the majority's ruling would have no bearing.
 
 
 80
 Second, Vermont will have a further opportunity to defend its law. The majority's conclusion perhaps results from Vermont's failure to put forth sufficiently clear evidence of the interests it sought to advance. If so, the failure is remediable because it occurred only at the preliminary injunction stage. Trial on the merits has yet to be held. The majority has found on the basis of the evidence presented at the hearing that the plaintiffs are likely to succeed on the merits; it has of course not ruled on the ultimate issue. If Vermont succeeds at trial in putting forth clear evidence that its laws were in fact motivated by the concerns discussed above (and not merely by consumer curiosity), it will have shown a substantial interest sufficient to satisfy the requirements of the First Amendment.
 
 
 
 [1]
 Although the dissent suggests several interests that if adopted by the state of Vermont may have been substantial, the district court opinion makes clear that Vermont adopted no such rationales for its statute. Rather, Vermont's sole expressed interest was, indeed, "consumer curiosity." The district court plainly stated that, "Vermont takes no position on whether rBST is beneficial or detrimental. However," the district court explained, "Vermont has determined that its consumers want to know whether rBST has been used in the production of their milk and milk products." 898 F.Supp. at 252 (emphasis added). It is clear from the opinion below that the state itself has not adopted the concerns of the consumers; it has only adopted that the consumers are concerned. Unfortunately, mere consumer concern is not, in itself, a substantial interest
 
 
 [1]
 As the majority has not found fault with the district court's ruling on the Commerce Clause claim, I will not address it except to note that I would affirm the district court's denial of a preliminary injunction on this ground as well
 
 
 [2]
 Indeed had the judge really intended such a finding, it would be unsupportable in view of the evidence that the concerns of the citizenry were communicated to the legislature. When the citizens of a state express concerns to the legislature and the state's lawmaking bodies then pass disclosure requirements in response to those expressed concerns, it seems clear (without need for a statutory declaration of purpose) that the state is acting to vindicate the concerns expressed by its citizens, and not merely to gratify their "curiosity." Vermont need not, furthermore, take the position that rBST is harmful to require its disclosure because of potential health risks. The mere fact that it does not know whether rBST poses hazards is sufficient reason to justify disclosure by reason of the unknown potential for harm
 
 
 [3]
 One of Vermont's experts, a specialist in medical information and the review of scientific literature, stated in an affidavit:
 [I]t is not reasonable to conclude that there is uniform agreement that milk from rBST treated cows is 100% safe for human consumption.... Longitudinal studies have been called for to establish the long-term health effects of the use of rBST on cows, and until the results of these studies are published, disagreement on the effects of rBST will likely continue.... Milk from rBST treated cows is generally considered safe by the Food and Drug Administration and some scientists, while the General Accounting Office and other scientists feel that more research is needed before a universal agreement can be reached.
 Affidavit of Dr. Julie McGowan, at 26-27.
 
 
 [4]
 The evidence included a cartoon, published in the Burlington Free Press: in frame 1, a man declares his confidence in the safety of rBST milk; in frame 2, he drinks the milk; in frame 3, he turns into a werewolf. Plaintiffs cite this cartoon as a demonstration that the concerns of Vermonters are fantastical. They overlook the fact that the cartoon is a joke. But like most jokes it has a basis in reality. The cartoon does not mean that Vermonters think rBST will turn them into werewolves. What it reflects is that, notwithstanding the FDA's assurances, consumers are worried about the effects of rBST
 
 
 [5]
 Indeed, a statistical sampling shows that this labeling makes milk from rBST-treated cows more acceptable to Vermont consumers. Before reading this sign, 86% of respondents preferred milk from untreated cows; after reading the sign, preference for milk from untreated cows fell to 73%
 
 
 [6]
 I disagree with the majority's contention, Maj. Op. at 74, that voluntary labeling by producers who do not use rBST can be relied on to effectuate Vermont's purpose. There is evidence that, notwithstanding the FDA's determination to permit such voluntary labeling, certain states, no doubt influenced by the rBST lobby, will "not allow any labeling concerning rBST." Affidavit of Ben Cohen, at 3-4. This effectively prevents multistate distributors from including such labeling on their packaging. Producers complying with Vermont's law do not face the same problem. The blue dot has meaning only in conjunction with the signs posted in Vermont retail establishments. Thus producers can inexpensively affix the blue dot without violating the laws of states that forbid all rBST labeling
 
 
 [7]
 Similarly, in Central Hudson, the Court observed that commercial speech is entitled to First Amendment protection because of its informational function. Thus, "[t]he government may ban forms of communication more likely to deceive the public than to inform it." 447 U.S. at 563, 100 S.Ct. at 2350
 
 
 [8]
 Justice Thomas, concurring separately, asserted that an effort to "keep legal users of a product or service ignorant in order to manipulate their choices in the marketplace" is "per se illegitimate." Liquormart, --- U.S. at ----, 116 S.Ct. at 1515 (Thomas, J., concurring)