Hoban v. State, No. 200-4-05 Wncv (Katz, J., Apr. 15, 2005)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT                                     SUPERIOR COURT
Washington County, ss.:                         Docket No. 200-4-05 WnCv


HOBAN

v.

STATE OF VERMONT


ENTRY


Petitioners are four elderly recipients of services under the Home and Community-Based Waiver Services Program administered by the State as part of Medicaid. For persons who have sufficient levels of disabilities to justify nursing home placement, this program attempts to permit such persons to continue to live in their own homes by providing services in the home. It thereby saves the State some of the cost of nursing home care, and provides recipients with an alternative to that often-dreaded fate.

The present case arises out of a notice recently sent by the State to perhaps 1,800 recipients under this program, advising them that a cap will be placed on their available services, set at 5.5 hours of service each week. That is considerably below the level presently provided. Although the cap took effect April 1, it will not reach each individual until that person's particular care plan is reviewed, which is an annual event. For first-

named plaintiff Hoban, that date is April 22. For the other named plaintiffs it is farther out. But for some members of the 1,800 not a part of this lawsuit, the cap may trigger a limit on services earlier, or may even have already had that effect. The ("IADL") services involved may include housekeeping, telephone, shopping, travel assistance, and care of adaptive equipment. It does not include what the State classifies as "ADL"–dressing, bathing, continence, and eating services. While the IADL services here involved are obviously very important to those receiving them, they probably stand below ADL services in the hierarchy of being essential.

For these reasons, the court scheduled a prompt hearing on petitioners' motion. In determining whether to grant a preliminary injunction, in advance of full consideration of all the issues in the case, as requested, we use the following standard:

> Generally, preliminary injunctive relief is appropriate when movant shows irreparable harm and either likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. However, when the inunction at issue stays government action taken in the public interest pursuant to a statutory scheme, the movant must satisfy the more rigorous "likelihood of success" prong.

International Dairy Foods Ass'n. v. Amestoy, 92 F.3d 67, 70 (2d Cir. 1996). Although it may appear unusual to cite federal precedent for what is a procedural question–standards for preliminary relief–we note that Vermont case law is sparse on the point. This is so because the grant or denial of such preliminary relief is not ordinarily appealable, unlike the situation in federal courts. See In re J.G., 160 Vt. 250, 255 (1993). Returning to that standard, it must be concluded that we are dealing here with governmental action pursuant to a statutory scheme, 33 V.S.A. §§

6301-03. So the question must be: Are plaintiffs likely to succeed on the merits?

Defendants' recent decision to impose a 5.5 hours-per-week cap on IADL benefits has not been promulgated as a regulation under Vermont's Administrative Procedure Act, 3 V.S.A. §§ 800-849. They argue that such a decision need not be so promulgated. On this issue, Plaintiffs refer us to In re Diel, 158 Vt. 549 (1992), and quite properly so, because it is controlling. Legislation authorizing Defendants to conduct a Home Care Program specifically authorizes the secretary "by rule" to establish procedures for its conduct. 33 V.S.A. § 6302(a). Defendants review the various categories in this subsection and argue that none of them specifically refer to the amounts of benefits to be paid to program beneficiaries. That may be a narrow reading, but perhaps defendants are correct on the point. But § 6302(e) requires the Secretary of Human Services to,

> promulgate rules, pursuant to [the Administrative Procedure Act], for the effective administration of this section. Such rules shall include but shall not be limited to eligibility standards . . ., standards for awarding services to be furnished under this chapter . . . and making allocations under subsection (c) . . . .

What is at issue here but an eligibility standard? Defendants have determined that program beneficiaries are no longer eligible for IADL services, and such shall not be awarded, once they have received 5.5 hours per week. It may be a very reasonable determination; it may indeed be a necessary one because of fiscal constraints. But it is a standard which determines if any member of the class of Home Care beneficiaries is eligible for IADL services–if they have already received 5.5 hours, they are not.

Even if § 6302's references to promulgating rules for Home Care did not exist, the Administrative Procedure Act's definition of what

constitutes a "rule" would require promulgation of the eligibility cap here at issue. A "rule" means "each agency statement of general applicability which implements, interprets or prescribes law or policy." 3 V.S.A. § 801(b)(9). This definition of "rule," and the concomitant requirement that rules be duly promulgated, is the central holding of <u>Diel</u>. In that case, the issue was the then-Department of Social Welfare's change of policy to no longer count fuel assistance payments as income, and then the implementation of that change. By no longer counting such payments as income, the effective income of recipients diminished, rendering them eligible for greater benefits. That "decision interpreted the statute authorizing the ANFC program and both prescribed and implemented a policy intended to apply generally to a class of ANFC recipients." 158 Vt. at 554. <u>Diel</u> goes on to cite out-of-state examples of welfare benefit rules which have been held to require promulgation under the Administrative Procedure Acts of their respective states:

> <u>Stratford Nursing & Convalescent v. Div. of Med.</u>
> <u>Assistance</u>, 522 A.2d 442, 444 (N.J. 1986) (agency "policy" affected Medicaid reimbursement of all similarly situated nursing homes and should have been adopted pursuant to administrative procedure act); <u>Hillcrest Home, Inc. v.</u>
> <u>Commonwealth Dept. of Pub. Welfare</u>, 553 A.2d 1037, 1040-42 (Penn. 1989) (change in agency's interpretation of "year" to mean calendar year instead of fiscal year was substantive change in regulation that could not be accomplished outside rulemaking procedure).

158 Vt. at 554-55 (footnote omitted). The Vermont Supreme Court's decision also quotes a number of factors identified by the Supreme Court of New Jersey which indicate whether a particular policy triggers the rulemaking process:

> the agency determination . . . (1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow[,] select

group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy.

158 Vt. at 555 n.* (quoting Metromedia, Inc. v. Director, Div. of Taxation, 478 A.2d 742, 751 (N.J. 1984)). We need not belabor the facts to conclude that, beyond dispute, the 5.5 cap here at issue applies to the entire Home Care class, operates prospectively only, describes a new standard nowhere else expressed, reflects a new administrative policy and reflects a decision on the administration of benefits in the nature of general policy. The only criterion we have excluded from this obviously included group is the "large segment" of the public, criteria (1). Here, we have been advised that the population of Home Care participants is 1,800 in number. In Metromedia v. Director, the issue was taxation of television and radio stations with multi-state audiences. Recognizing that New Jersey is a populous state, nevertheless, it surely does not have anything approaching 1,800 television and radio stations with multi-state audiences. The court there, albeit over dissent, nevertheless held that the taxation policy was invalid for lack of promulgation as an administrative regulation. Indeed, Diel involved a group of 750 ANFC families. 158 Vt. at 550. If 750 suffices, so does 1,800.

During the second discussion of this motion between the court and counsel, the State pressed the point that, regardless of the holding of Diel, the Legislature has since changed the APA's definition of regulation and

what must be actually promulgated.  2001 (Adj. Sess.) Public Laws of Vermont, No. 149, §§ 45-53 (2002).  In the State's view, Diel has been effectively overruled by these recent changes.  We do not doubt the Legislature's general authority to alter what was essentially a decision of statutory interpretation, by subsequent legislation.  As with any issue of statutory interpretation, the foremost duty of this court is to discern the legislative intent, so that it can effectively be carried out.  In re S. Burlington-Shelburn Highway Proj., 174 Vt. 604, 605 (2002).  Clearly, one intent of the 2002 APA amendment was to reduce the situations in which administrative rules must be promulgated.  Hence, 3 V.S.A. § 831(e) was added, "Except as provided in subsections (a)-(d) of this section, an agency *shall not be required* to initiate rulemaking or to adopt a procedure or a rule." (Emphasis supplied).  However, a review of subsections (a) through (d) reveals four instances in which rulemaking remains required:

- due process (§ 831(a));
- statutory direction (§ 831(a));
- request by 25 or more persons (§ 831(c)); and
- request by legislative committee on rules (§ 831(c)).

Subsection (c) hence lists two situations in which rulemaking is required, in addition to the two provided in (a).  Subsection (c) concludes with the sentence "An agency shall not be required to initiate rulemaking with respect to any practice or procedure except as provided by *this subsection*." (Emphasis supplied).  To the extent this last-quoted sentence applies to the present dispute, it would seem to be in conflict with subsection (a), which, as has just been shown, provides two of the four situations in which rulemaking is required.  Further, to the extent this last-quoted sentence gives a blanket exclusion from rulemaking, except for the bases set out in (c), it would be redundant and unnecessary, for subsection (e) is even broader.  Subsection (e) is not limited to points of "practice or procedure," as is (c).  Following the venerable rules of statutory construction, that language is not presumed to be included inadvisedly, Payea v. Howard Bank, 164 Vt. 106, 107 (1995), and that needless redundancy is a disfavored construction, State v. Fisher, 167 Vt. 36, 41 (1997), we conclude that the Legislature continues to draw some level of

distinction between "practice and procedure" and those situations in which rulemaking is required.

Continuing the effort to understand the legislative intent undergirding the 2002 APA amendments, so that they may be properly applied, we look to the context of these changes. <u>Domenchini's Administrator v. Hoosac Tunnel & Wilmington R.R.</u>, 90 Vt. 451, 456 (1916) (relying on context of disputed section in original act to determine meaning). Doing so, we find that they appear in a quite unusual context – not in a separate enactment, but in a part of the capital construction bill, specifically "An Act Relating to Capital Construction, State Bonding and the Department of Corrections." The amendments to the APA are sandwiched in between provisions specifically relating to the Department of Corrections. See, e.g., § 42 (reduction in term for good behavior); § 43 (housing of inmates); § 44 (conditional re-entry into the community); § 55 (violation of conditions by parolees and probationers); § 56 (out-of-state parolee supervision). As previously noted, §§ 45-54 constituted the APA revisions. Attempting to understand why the legislative Institutions Committees would have determined to revise the APA, it may be appropriate to understand an historical context. See, e.g., <u>Com. v. Hughes</u> 865 A.2d 761, 797 (Pa. 2004) (examining historical circumstances contemporaneous with statutory amendment to help reveal the amendment's purpose). A persuasively relevant occurrence would have been provided by the decision in <u>Parker v. Gorczyk</u>, 173 Vt. 477, in September, 2001. That case invalidated a Department of Corrections policy regarding inmate furloughs, because that policy legally constituted a rule and therefore required rulemaking under the APA. Placing this context next to the close reading of the statutory language of our previous paragraph persuades us that it was not the legislative intent to overrule <u>Diel</u>, which is not a Corrections case.

We therefore conclude that <u>Diel</u>, Vermont's Administrative Procedure Act, and the Home Care Programs statute all clearly require that a cap on services, generally applicable to all Program participants, must be promulgated as a regulation under the APA. A policy change

violative of the APA is void.  <u>Diel</u>, 158 Vt. at 550.  As a lower court, we are, of course, required to follow both precedent and statute.  As a court, it is beyond our authority to weigh the importance of this or that benefit against its cost.  There is no doubt that reducing some benefits may allow those that remain to be passed on to more people.  These are decisions for the elected branches of government.  We have no view as to the fairness or soundness of any policy judgment undergirding the 5.5 hour cap.  We must, however, rule that petitioners here are reasonably likely to prevail on their procedural claim, and are entitled to preliminary relief.  If a formal injunction is required, after discussion among counsel, petitioners shall submit a proposed form thereof.


      Dated at Montpelier, Vermont, _____, 200__.



                                        _____
                                               Judge