**WESTERN MOHEGAN TRIBE AND NATION OF NEW YORK; and Ronald A. Roberts, individually and as Chief of the Western Mohegan Tribe and Nation aka Chief Golden Eagle, Plaintiffs,**

**v.**

**The State of NEW YORK; New York State Office of Parks, Recreation, and Historical Preservation; Bernadette Castro, sued herein in her official capacity as Commissioner of the New York State Office of Parks, Recre-**

ation, and Historic Preservation; George E. Pataki, sued herein as Governor of the State of New York; James H. Malloy, Inc.; and John Doe(s), individually and severally, Defendants.

No. 99–CV–2140 LEK/DRH.

United States District Court,
N.D. New York.

May 25, 2000.

Alvin O. Sabo, Donohue, Sabo Law Firm, Albany, NY, for plaintiff.

Christopher W. Hall, Office of Atty. Gen., Albany, NY, for defendants.

## MEMORANDUM—DECISION AND ORDER

KAHN, District Judge.

Presently before the Court is Plaintiffs' motion for a preliminary injunction. For the reasons set forth below, that motion is denied and the case dismissed *sua sponte*.

### I. BACKGROUND

Plaintiff Roberts is the alleged chief of the Western Mohegan Tribe and Nation, a non-federally recognized Native American tribe. Plaintiffs contend that Schodack Island (the "Island"), a series of connected peninsulas located on the eastern shore of the Hudson River just south of the Village of Castleton–on–Hudson, is a site of religious and cultural significance to the tribe; New York State is in the process of turning the island into a state park for passive recreational activities such as picnicking, fishing, boating and camping.

Planning for the Schodack Island State Park (the "Park") occurred over two stages. From 1986 – 89, defendant New York State Office of Parks, Recreation and Historic Preservation ("OPRHP"), the state agency with jurisdiction over the Island, conducted a series of public meetings and worked with a local public advisory committee to develop a Master Plan, a comprehensive planning guide outlining the direction of the Park by balancing recreational needs with concerns for environmental and cultural resources. These planning efforts stalled until 1996 when the State renewed its focus on providing the public with recreational opportunities and access along the Hudson River. OPRHP relied on the prior public comment in presenting the Final Master Plan that reduced the size and number of programs originally considered. During the planning process, OPRHP determined to avoid an area thought to be the site of a former Mahican[1] village well south of the construction at issue in this case. More-

over, OPRHP contends that it intended to employ methods of construction that would be least likely to impact potential subsurface artifacts and remains.

In addition to the initial public comment, OPRHP again invited extensive comment prior to the Final Master Plan's adoption in August 1998 through various publications. In the course of this second round of public comment, OPRHP received comments from the Stockbridge–Munsee Tribe, a federally recognized Native American Tribe descended from the Mahicans, and the Muhhecunnew National Confederacy, a non-federally recognized entity. The Stockbridge–Munsee Tribe subsequently endorsed the Final Master Plan. At no point did Plaintiffs participate in the comment process.

In February 1999, defendant OPRHP began construction of a bridge and roadway to create public land access to the Park. The federal government owns a parcel of land to the extreme southerly end of the island chain on Houghtaling Island in Green County that has been placed under the jurisdiction of the United States Army Corps of Engineers (the "Corps"); that parcel is not part of the Park. To date, construction activity on the Island has consisted of road clearing, removal of brush and trees, and the bringing of fill to the site for the purposes of building up the access roads on both sides of the bridge span.

Plaintiff Roberts commenced this action on August 9, 1999, seeking a preliminary injunction and alleging violations of the Native American Graves Protection and Repatriation Act, 25 U.S.C. § 3001, *et seq.* ("NAGPRA"), and their Free Exercise rights under the First Amendment. In a decision issued September 2, 1999, this Court held that it lacked jurisdiction under NAGPRA and found the Free Exercise claim too vague to meet the demanding

---

1. As discussed infra, there is some dispute over whether Mahican and Mohegan are merely variant spellings for the same tribe or denote two distinct tribes.

standard required for a preliminary injunction.

Undaunted, Plaintiffs commenced a second suit on December 9, 1999. Plaintiffs now allege claims under NAGPRA, the National Historic Preservation Act, 16 U.S.C. § 470, *et seq.* ("NHPA"), the Free Exercise Clause of the First Amendment to the United States Constitution, and 42 U.S.C. § 1983, seeking an order that (i) enjoins construction of the bridge connecting the mainland to the Island and (ii) orders the OPRHP to conduct a new archeological survey.

## II. ANALYSIS

In most cases, a party seeking a preliminary injunction must demonstrate (1) that it will be irreparably harmed in the absence of an injunction, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits of the case to make them a fair ground for litigation, and a balance of hardships tipping decidedly in its favor. *See, e.g., Genesee Brewing Co. v. Stroh Brewing Co.,* 124 F.3d 137, 142 (2d Cir. 1997). One exception to the ordinary standard is that, where a preliminary injunction is sought against government action taken in the public interest pursuant to a statutory or regulatory scheme, the less-demanding "fair ground for litigation" standard is inapplicable, and therefore a "likelihood of success" must be shown. *See International Dairy Foods Ass'n v. Amestoy,* 92 F.3d 67, 70 (2d Cir.1996). This higher standard reflects judicial deference toward "legislation or regulations developed through presumptively reasoned democratic processes." *Able v. United States,* 44 F.3d 128, 131 (2d Cir.1995) (per curiam).

Defendants argue that an even more rigorous standard—requiring a "clear" or "substantial" showing of likelihood of success—should apply because "(i) an injunction will alter, rather than maintain, the status quo, or (ii) an injunction will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." *Tom Doherty Assocs. v. Saban Entertainment, Inc.,* 60 F.3d 27, 33–34 (2d Cir.1995). In this case, however, the preliminary injunction sought by Plaintiffs in this case would not lead to significant and irreversible alterations to the status quo. A mandatory injunction seeks to alter the status quo by a positive act, not a negative one as in the case *sub judice.* If the injunction is granted and Defendants prevail at trial, then construction can begin on the Island and no harm has been done that cannot be undone. Plaintiffs therefore must demonstrate only a likelihood of success on the merits.

## A. NAGPRA

NAGPRA governs the disposition of Native American cultural items that are "excavated or discovered on federal or tribal lands." 25 U.S.C. § 3002(a). As this Court concluded in its prior decision, the Island does not fall within the scope of NAGPRA's jurisdiction since it is neither federal nor tribal land within the statute's meaning.

Federal lands are defined in relevant part as "land other than tribal lands which are controlled or owned by the United States." § 3001(5). While the Corps did issue a permit to Defendants to permit construction, that permit does not transform the Island into federal property or place it under the United States' "control." Similarly, the right-of-way across the entire Island that Plaintiffs allege the federal government granted to them on October 14, 1999 is actually a license to be present on the federally owned parcel on Houghtaling Island and does not extend to the entire Island; indeed, the Corps regularly seeks permits from the State to be present in the Park. Plaintiffs' broad reading of the statute is inconsistent with NAGPRA's plain meaning and its legislative history where the language "federal lands" denotes a level of dominion commonly associated with ownership, not funding pursuant

to statutory obligations or regulatory permits. *See* 1990 U.S.Code Cong. & Admin.News at 4367–4392.

The Island also fails to qualify as "tribal land," which the statute defines in pertinent part as "all lands within the exterior boundaries of any Indian reservation." § 3001(15)(A). There is no feasible claim that the Island, or projected Park area, comprises part of an Indian reservation.

■ Moreover, NAGPRA applies to cultural and funerary objects already possessed or under the control of a Federal agency or museum, see §§ 3003, 3004, or those already discovered or excavated, see § 3002. At no time has the OPRHP site monitor see any indication of Native American artifacts; and OPRHP interviewed 34 workers from defendant Maloy's construction crew to determine whether anyone had seen any artifacts whatsoever in the course of construction, and no one had. Thus, even if NAGPRA were to apply, which it does not, the claim is premature.[2]

## B. NHPA

■ Congress enacted the NHPA to establish a federal policy of "contribut[ing] to the preservation of nonfederally owned prehistoric and historic resources and giv[ing] maximum encouragement to organizations and individuals undertaking preservation by private means." 16 U.S.C. § 470–1(4). Under the National Historical Preservation Act Amendments of 1992, "properties of traditional religious and cultural importance to an Indian tribe ... may be determined eligible for inclusion on the National Register" and federal agencies are directed to consult "with any tribe ... that attaches religious and cultural significance to [such] properties." 16 U.S.C. § 470a(d)(6)(A)–(B). The federal government acknowledges that site specific

worship is vital to Indian religious practices. Recently the executive branch has ordered federal agencies to: (1) accommodate access to and ceremonial use of Indian sacred sites by Indian religious practitioners and (2) avoid adversely affecting the physical integrity of such sacred sites. *See* Exec. Order 13007, 61 Fed.Reg. 26771. Numerous other laws generally protect Indian religion and allow access to and/or temporary closure of specific tribal sacred sites located on federal lands. *See,* 16 U.S.C. § 228i(c) (preserving access to Grand Canyon National Park for Indian religious purposes); 16 U.S.C. § 410pp–6 (authorizing temporary closures of Cibola Historical Park for Indian religious services).

Plaintiffs contend that Defendants violated the NHPA by failing to consult with descendants of the aboriginal inhabitants and relying upon a flawed archeological examination of the Park site.

Section 106 of the NHPA provides:

The head of any Federal agency having direct or indirect jurisdiction **over a proposed Federal or federally assisted undertaking** in any State and the head of any Federal department or independent agency having authority to license any undertaking shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation established under sections 470i to 470v of this title a

---

**2.** Plaintiffs raised the same NAGPRA claim previously disposed of in this Court's September ruling, the absence of any change in law or discovery of additional facts notwithstanding, based on their belief that the prior dismissal was granted in order to permit Plaintiffs to retain counsel and refile the motion.

To the extent that this argument was made in good faith and rises beyond the merely disingenuous, the Court notes that both in the bench decision and subsequent order that the jurisdictional impediment was expressly stated and Plaintiffs directed to proceed in state court.

reasonable opportunity to comment with regard to such undertaking.

16 U.S.C. § 470f (emphasis added). Plaintiffs maintain that the permit Defendants obtained from the Corps triggered the NHPA. Plaintiffs err. The Park is not a federal or federally assisted project.

The lack of federal funding for or jurisdiction over the Park bars application of the NHPA. An "undertaking" that triggers the statute is defined as:

> a project, activity, or program **funded in whole or in part under the direct or indirect jurisdiction of a Federal agency,** including
>
> (A) those carried out by or on behalf of the agency;
>
> (B) those carried out with Federal financial assistance;
>
> (C) those requiring a Federal permit, license, or approval; and
>
> (D) those subject to State or local regulation administered pursuant to a delegation or approval by a Federal agency.

16 U.S.C. § 470(w)(7) (emphasis added). "In order for a project to be 'federally assisted' within the meaning of NHPA ... it must be wholly or partially funded with federal money. It is this money which imparts a federal character to a project and gives rise to the necessity of meeting the statutory requirements of those two acts. Without such federal funds, the project remains local in nature." *O'Brien v. Brinegar,* 379 F.Supp. 289, 290 (D.Minn. 1974). *See Named Individual Members of San Antonio Conservation Society v. Texas Highway Dept.,* 446 F.2d 1013, 1028 (5th Cir.1971); *Silva v. Romney,* 473 F.2d 287, 289–90 (1st Cir.1973). Of the seven sources of funding for the Park, none are federal in any way whatsoever: the Park is being funded exclusively by New York State. Local actions fall beyond the scope of the NHPA's protections. However desirable it undoubtedly is to preserve our national heritage, the NHPA is a federal statute. To states and localities, the NHPA announces a policy goal; it imposes no obligations.

The Corps' permit itself is insufficient to transform the Park into a federal project. As explained above, the permit merely allows the State access to contiguous federal property, and in no way extends the Corps' jurisdiction over the entire Island or Park. Section 470(w)(7)(C) includes those projects "requiring a Federal permit, license, or approval," but the federal permit here did not go to the project's authorization or regulation, but merely its practical feasibility and was therefore not legally required. Indeed, even if it was, the NHPA clearly contemplates a federal funding requirement. *See* 16 U.S.C. § 470(w)(7). The Park simply is not "funded in whole or in part under the direct or indirect jurisdiction of a Federal agency."

## C. First Amendment

■ While the injunction at issue concerns only construction of the access bridge, the Court is inclined to address the merits of the First Amendment claim for purposes of judicial economy.

Violations of First Amendment rights "are commonly considered irreparable injuries for the purposes of a preliminary injunction." *Bery v. City of New York,* 97 F.3d 689, 693 (2d Cir.1996), *cert. denied,* 520 U.S. 1251, 117 S.Ct. 2408, 138 L.Ed.2d 174 (1997); *see also Deeper Life Christian Fellowship, Inc. v. Board of Educ.,* 852 F.2d 676, 679 (2d Cir.1988) ("[The] loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"). In the context of this case, whether Plaintiffs have satisfied the requirements for a preliminary injunction on the basis of their First Amendment claim therefore turns on whether they have shown a likelihood of success on the merits of their claim that the State's proposed fees for access to the Island violates their Free Exercise rights. *See Beal v. Stern,* 184 F.3d 117, 123–24 (2d Cir.1999).

If worship on the Island is part of the religious practice of the descendants of the Island's original inhabitants, then the State's imposition of an entry fee raises serious constitutional issues. As a threshold matter, however, the Court must determine that Plaintiffs have standing to assert a First Amendment claim. Unless a litigant suffers a personal injury that could be redressed by a decision in its favor, there is no standing to assert the claim. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). There is therefore a critical question concerning Plaintiffs' status: are they Native Americans, and, if so, descendants of the original tribe on the Island?

Plaintiffs makes various allegations of federal and state recognition of the Western Mohegan Tribe and Nation that are baseless. First, it is contended that the letter from the Corps to plaintiff Roberts dated October 14, 1999 that granted him access to the federal parcel on Houghtaling Island for religious worship constitutes federal recognition. In fact, the letter is merely a right of entry that confers no government-to-government recognition of any kind; the use of the word "chief" in referencing plaintiff Roberts is purely honorific, as has been my own use of the word in various oral arguments and encounters with plaintiff Roberts. In fact, the Bureau of Indian Affairs (the "BIA") is the only agency empowered to recognize Native American tribes; Plaintiffs previous application for recognition was rejected due to significant deficiencies, unverifiable statements, doctored original documents, and significant omissions in all areas required by the acknowledgment regulations. *See* Affidavit of R. Lee Fleming, BIA, sworn to April 28, 2000, Exhibit A at 2.

Similarly, Justice John G. Dier, New York State Supreme Court, Washington County, describes plaintiff Roberts as "Chief of the Mohegan Tribe and Nation" in a decision he issued on July 3, 1993 enjoining Roberts from operating a bingo parlor in conjunction with other "members of the Western Mohegan tribe." Plaintiffs seize upon these references to argue that the decision recognized Plaintiffs' status which was argued before Justice Dier. Actually, judging from the brief submitted by the State to Justice Dier, the focus was entirely on plaintiff Roberts' failure to obtain a license or comply with the state gambling ordinance: Plaintiffs status was irrelevant to Justice Dier's decision, and was not even litigated. *See* Affidavit of Edward M. Scher sworn to May 5, 2000, ¶¶ 4–6.

Equally damaging to Plaintiffs First Amendment claim is the very real possibility that the Mohegan tribe from which they allegedly descend never inhabited the Island. *See* Affidavit of Paul R. Huey, Ph.D., New York State Bureau of Historic Sites, sworn to April 27, 2000. Dr. Huey, an archeologist with an interest in local history and anthropology, persuasively argues that the Mahicans—a tribe with no cultural links to the Mohegans and actually hostile to them—occupied the Island. According to Dr. Huey, the Island's very name "Schodack" derives from a combination of the Mahican words for fire—"ischoda"—and earth or land—"akee." By contrast, the Mohegans, a Connecticut tribe, employed a completely different dialect in which the word for fire was "squotta."

Defendants have submitted various excerpts from historical works, including a letter from George Washington, in which the words Mohegan and Mahican are used interchangeably. Following a review of Dr. Huey's affidavit, a strong case exists that these authors were simply wrong, and works such as James Fenimore Cooper's further muddied the waters by use of the ahistorical term "Mohican."

The historical record is thus far from clear that Plaintiffs are Native American and that the tribe from which they allege descent ever dwelled on the Island. Absent such proof, the fee imposes no cognizable injury on Plaintiffs.

## III. CONCLUSION

Plaintiffs have not only failed to show a likelihood of success on the merits of any of their claims, but also demonstrated jurisdictional impediments to their federal claims. Lacking jurisdiction over Plaintiffs' NAGPRA and NHPA claims, this Court has a duty to dismiss them *sua sponte*. *See Louisville & Nashville Railroad v. Mottley,* 211 U.S. 149, 152, 29 S.Ct. 42, 53 L.Ed. 126 (1908); *McLearn v. Cowen & Co.,* 660 F.2d 845, 848 (2d Cir.1981). Since standing is also a question of this Court's subject matter jurisdiction, see *Warth v. Seldin* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), Plaintiffs' First Amendment claim must likewise be dismissed. *See* Fed.R.Civ.P. 12(h)(3). Plaintiffs' remaining federal claim is brought under 42 U.S.C. § 1983. Although § 1983 serves "to ensure that an individual [has] a cause of action for violations of the Constitution," the statute itself "does not provide any substantive rights at all." *Chapman v. Houston Welfare Rights Org.,* 441 U.S. 600, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979).

In the absence of any surviving federal claims, this Court declines to exercise supplemental jurisdiction over the pendent state claims. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 716, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). A district court may exercise supplemental jurisdiction over pendent state claims when it has jurisdiction over associated federal claims that "form part of the same case or controversy." See 28 U.S.C. § 1367. Since this Court's subject matter jurisdiction rested on unsustainable federal claims, supplemental jurisdiction is inappropriate. *See Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867 (2nd Cir.1998)

Accordingly, it is hereby

ORDERED that Plaintiffs' motion for a preliminary injunction is DENIED and the case DISMISSED *sua sponte* for lack of subject matter jurisdiction; and it is

FURTHER ORDERED that the Clerk of the Court serve a copy of this Order on all parties by regular mail.

IT IS SO ORDERED.